# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 25-484C
(Filed: July 24, 2025*)

|  |  |
|---|---|
| **GEMINI TECH SERVICES LLC**, | ) ) ) |
| *Plaintiff,* | ) ) ) |
| v. | ) ) ) |
| **UNITED STATES**, | ) ) ) |
| *Defendant,* | ) ) ) |
| and | ) ) ) |
| **RED RIVER SCIENCE & TECHNOLOGY, LLC**, | ) ) ) ) |
| *Defendant-Intervenor.* | ) ) |

*Matthew T. Schoonover*, Schoonover & Moriarty LLC, Olathe, KS, for plaintiffs. With him on the briefs were *Ian P. Patterson*, *Timothy J. Laughlin*, and *Haley M. Sirokman*, Schoonover & Moriarty LLC, Olathe, KS.

*Nathanael B. Yale*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. With him on the briefs were *Yaakov M. Roth*, Acting Assistant Attorney General, and *Patricia M. McCarthy*, Director, and *William J. Grimaldi*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC. *Carter Cassidy*, Trial Attorney, U.S. Army Legal Services Agency, Fort Belvoir, VA.

---

* This opinion was originally filed under seal on July 21, 2025. The Court provided the parties an opportunity to review the decision for any proprietary, confidential, or other protected information and submit proposed redactions. In a joint filing, plaintiff and defendant-intervenor proposed a series of redactions. Unless otherwise noted, the redactions adopted by the Court are denoted using "{redacted}."

*J. Eric Whytsell*, Stinson LLP, Denver, CO, for defendant-intervenor. With him on the briefs were *Susan Warshaw Ebner*, *Alexandra P. Stanley*, and *Simone T. Stover*, Stinson LLP, Denver, CO.

## OPINION AND ORDER

*BONILLA, Judge*.

This matter involves a post-award bid protest of a United States Army contract to perform maintenance, supply, and transportation support services for a military installation. Plaintiff Gemini Tech Services LLC (Gemini) first challenges its elimination from award consideration, focused on two interrelated issues: the Army's determination that Gemini impermissibly capped its proposed overhead and general and administrative expenses (G&A) rates, compounded by the agency's failure to seek clarification. Gemini further contests the award of the contract to defendant-intervenor Red River Science & Technology, LLC (Red River), alleging two additional errors: the Army improperly waived strict compliance review *after* conducting the review and then failed to subject Red River's cost proposal to the same scrutiny that caused Gemini's disqualification.

Pending before the Court are plaintiff's motion for judgment on the administrative record (ECF 27) and defendant's and defendant-intervenor's cross-motions for judgment on the administrative record (ECF 29, 34). For the reasons below, plaintiff's dispositive motion is DENIED and defendant's and defendant-intervenor's dispositive cross-motions are GRANTED.

## BACKGROUND

The Enhanced Army Global Logistic Enterprise (EAGLE) program facilitates the military's procurement of global logistics support services, including maintenance and supply operations and transportation services. Comparable to master service agreements, the EAGLE program allows qualified basic ordering agreement (BOA) holders to compete for military support service task orders. The events giving rise to this bid protest stem from the Army's July 19, 2024 solicitation of global logistics services for Fort Knox, located in Kentucky. The request for proposals (RFP) was issued as a competitive Small Business Administration certified 8(a) program set-aside for EAGLE BOA holders. The acquisition employed a best value source selection process using three evaluation factors: technical, past performance, and cost/price. Red River is the incumbent contractor.

According to the RFP, evaluation of submitted proposals would begin with a strict compliance review starting with the lowest priced proposal and continuing to higher priced proposals until the greater of five proposals or twenty percent of the proposals received were found compliant. Those proposals would then move on to step one: technical evaluation. Relevant here, the RFP generally provides: "The

government reserves the right to waive the Strict Compliance Review if it is in the Government[']s best interest."  AR 737 (¶ M.3)[1]; *accord id.* (¶ M.2: "The Government reserves the right to: waive the strict compliance review . . . .").  Upon the completion of step one, the three lowest priced technically acceptable proposals would advance to step two: evaluation of past performance and cost/price.  All proposals receiving a "substantial confidence" qualitative assessment rating for past performance and found to have a "realistic cost" would move to step three, where the government would award the global logistics services contract to the lowest responsible offeror.  AR 738.

As originally published, the RFP was silent on the issue of capping or discounting indirect rates.  Two weeks later, on August 2, 2024, the Army issued Modification 1, which included the following provision:

> Capping of Discounted Indirect Rates. Offerors, or its subcontractors shall not be permitted to voluntarily cap or offer discounted indirect rates that are not supported by the data required [in the preceding] paragraphs . . . . Offerors proposing capped or discounted indirect rates will not be evaluated and will not be further considered for award.

AR 610 (¶ L.5.4.2.13(b)(5)).  Five proposals were submitted in response to the EAGLE task order solicitation by the September 4, 2024 deadline, including those of Gemini and Red River.

Addressing the proposed "[x]% Overhead rate"[2] for the performance period spanning six years, Gemini explained:

> [Gemini's] Overhead rate used within this offer is based on an analysis of budgeted Overhead Pool costs divided by the budgeted Total Direct Labor costs by period. [Gemini] evaluated the Overhead related costs within our 2023 audited financials and included budgeted costs based on our evaluation of those 2023 figures as well as an analysis of anticipated awards from 2024 through 2029. Pooled costs include Overhead labor, travel and other overhead expenses. Similarly, the Total Direct Labor cost basis is derived from existing programs and anticipated, upcoming awards. The Budgeted Overhead rate used within this offer is **[x]%**. [Gemini] acknowledges that the 2023 historical rate is higher than the [x]% budgeted rate. However, [Gemini] has implemented automated systems and adjusted corporate staffing during

---

[1] "AR __" is a citation to a Bates numbered page in the administrative record filed in this case.

[2] As discussed throughout this opinion, Gemini proposed separate flat rates for overhead and G&A. To denote that the two rates are different from each other yet fixed percentages while respecting Gemini's request to maintain the confidentiality of the precise numerical values, the overhead rate is represented as "[x]%" and the G&A rate is reflected as "[y]%."

3

> 2024 that yields greater efficiencies and reduces the burden of overhead labor required to support our projects. We are committed to the [x]% Overhead rate applied within this offer and will abide by said rate should an award be made to [Gemini] in support of this effort.

AR 1447 (bold in original). Using nearly identical language in support of the proposed "[y]% G&A rate"[3] across the relevant timeframe, Gemini explained:

> The G&A rate used within this offer is based on an analysis budgeted G&A pool costs divided by total direct costs. The G&A rate used within this offer is **[y]%**. This rate is supported by the pool costs listed within the Budgeted G&A tab of the [Indirect Expense Rate Detail (IERD)] Excel file. Pool costs relate to G&A labor, travel, automobile related expenses, corporate insurance policies, professional fees, taxes and license costs, as well as utility and communication expenses. [Gemini] has included historical pool cost details for 2021, 2022 and 2023 within the IERD Excel file in support of the historical G&A rates. [Gemini] acknowledges that the 2023 historical rate is higher than the [y]% budgeted rate. However, [Gemini] has implemented automated systems and adjusted corporate staffing during 2024 that yields greater efficiencies and reduces the burden of labor required to support our projects. We are committed to the [y]% G&A rate applied within this offer and will abide by said rate should an award be made to [Gemini] in support of this effort.

*Id.* (bold in original).

Upon receipt of the five proposals, the procuring contracting office performed a strict compliance review. Deficiencies were identified in at least three of the proposals.[4] In a Memorandum for Record dated September 9, 2024, the Procuring Contracting Officer documented the government's decision to "waiv[e] the Strict

---

[3] *See supra* note 2.

[4] There is some confusion in the record presented regarding which and how many proposals failed the strict compliance review. The strict compliance review worksheets, presumably created between September 4 and 9, 2024, identify all except Gemini's proposal as including non-compliant items. In contrast, the September 9, 2024 Memorandum for Record documenting the waiver of strict compliance, discussed *infra*, simply states that the review identified deficiencies in three of the five proposals submitted without identifying either set of offerors. Compounding the confusion, the February 11, 2025 recommendation of the Source Selection Evaluation Board (SSEB) and the decision of the Source Selection Authority (SSA) both note three non-compliant proposals but differ in the identities of the two camps. The SSEB recommendation lists Gemini as compliant, whereas the SSA decision lists Gemini as non-compliant. During oral argument, the government conceded the SSA's February 11, 2025 identification of Gemini as non-compliant was in error, and represented that the Procuring Contracting Officer summarily dismissed the sole deficient item noted in the strict compliance review worksheets for non-party "Offeror A" (i.e., inclusion of an extra tab).

Compliance requirement of the evaluation criteria to allow greater competition and ultimately maximize the Government's ability to obtain the best value." AR 4094. In further support of the waiver, the contracting official explained:

> Excluding these offerors from further evaluations due to non-compliance would significantly reduce competition and is not in the Government's best interest. Moreover, having only two offerors proceed to the technical evaluations is not advantageous to the Government. If one or even both offerors are deemed technically unacceptable, then the Government would expend valuable time and resources evaluating the additional offerors.

*Id.*

Six weeks later, the Army revisited the issue of capped and discounted indirect rates. Rather than allow EAGLE BOA holders to offer caps and discounts on their overhead, G&A, and fringe rates so long as they were amply supported, the Army issued a blanket prohibition. The reversal was prompted by an August 19, 2024 directive issued by the Executive Director of Army Contracting Command – Rock Island to remove capped indirect rates from all future EAGLE task order awards. The reason cited: "the capping of indirect rates such as Fringe and G&A has significantly put Small Businesses at risk of performing services by not allowing them to adjust rates based upon the economy." AR 4093. Through Modification 5, adopted on October 16, 2024, the solicitation was updated to reflect the recent directive:

> Capping or Discounted Indirect Rates. Offerors, or its subcontractors shall not be permitted to voluntarily cap or offer discounted indirect rates. Offerors proposing capped or discounted indirect rates will not be further considered for award.

AR 667 (¶ L.5.4.2.13(b)(5)). Offerors were then given two weeks to submit updated proposals.

All five original EAGLE BOA holders submitted revised proposals in response to Modification 5, including Gemini and Red River. Because the Procuring Contracting Officer previously waived the strict compliance requirement, all five proposals advanced to step one: technical evaluation. Each proposal was found technically acceptable. The three lowest priced technically acceptable proposals (i.e., Gemini, Red River, and non-party "Offeror A") proceeded to step two: past performance and cost/price evaluation. Both Gemini and Red River received the required substantial confidence qualitative assessment rating for past performance. "Offeror A" received the lesser satisfactory past performance confidence rating and, consequently, was removed from further consideration and evaluation. In accordance with solicitation protocol, the next lowest priced technically acceptable proposal—

submitted by non-party "Offeror E"—replaced "Offeror A" in step two. "Offeror E" received the required substantial confidence rating for past performance.

Critical here, Gemini's October 30, 2024 revised proposal included the identical cost/price language regarding the "[x]% Overhead rate" and "[y]% G&A rate" used in the contractor's September 4, 2024 proposal, quoted *supra*. *Compare* AR 1447, *with* AR 4850. Performing a cost realism analysis, the procuring contracting office cited these provisions in support of adding nearly ${redacted} to Gemini's total proposed price as a most probable cost adjustment. Notwithstanding the upward adjustment, Gemini's total evaluated price remained the lowest among the technically acceptable proposals receiving the minimally required performance confidence rating.

However, in a memorandum dated December 23, 2024, the cost analyst also flagged the flat "[x]% Overhead rate" as a potential disqualifying cap:

> . . . [Gemini] stated in their IERD narrative that, "We are committed to the [x]% Overhead rate applied within this offer and will abide by said rate should an award be made to [Gemini] in support of this effort." This sentence could be interpreted as capping the [x]% Overhead rate should the award be made to [Gemini]. To abide by the said rate of [x]% should the award be made to [Gemini] indicates that if the audited Overhead rate is higher than [x]% for 2024-2029, [Gemini] would use the [x]% [Overhead] rate as proposed, which is capping their indirect rate. Per the solicitation Section L, Paragraph L.5.4.2.13(b)(5) Capping or Discounted Indirect Rates. "Offerors, or its subcontractors shall not be permitted to voluntarily cap or offer discounted indirect rates. Offerors proposing capped or discounted indirect rates will not be further considered for award." If [Gemini's] intent of "abiding by" the [x]% Overhead rate is to use this rate even if the indirect rate audit determines an Overhead rate higher for 2024-2029, this would be considered capping their Overhead rate and [Gemini] should not be further considered for award per L.5.4.2.13(b)(5).

AR 8953 (emphasis omitted). The analyst made identical observations regarding Gemini's proposed flat "[y]% G&A rate." AR 8967. Thereafter, in a memorandum dated January 13, 2025, the cost analyst was more definitive:

> . . . [Gemini] stated in their IERD narrative that, "We are committed to the [x]% Overhead rate applied within this offer and will abide by said rate should an award be made to [Gemini] in support of this effort." The analyst interprets this language as the offeror's intent to cap their Overhead rate at [x]% should the award be made to [Gemini]. Per the solicitation Section L, Paragraph L.5.4.2.13(b)(5) Capping or Discounted Indirect Rates. "Offerors, or its subcontractors shall not be permitted to

voluntarily cap or offer discounted indirect rates. Offerors proposing capped or discounted indirect rates will not be further considered for award."

AR 8924 (emphasis omitted). The analyst made the identical conclusion regarding Gemini's proposed flat "[y]% G&A rate." AR 8938.

After reviewing the cost realism and price analysis reports, and consulting with the SSEB, the SSA concluded that Gemini's proposed flat "[x]% Overhead rate" and "[y]% G&A rate" constituted disqualifying self-imposed caps (or discounts) on indirect rates in violation of ¶ L.5.4.2.13(b)(5) of the RFP. Consequently, as reflected in the Source Selection Decision Document dated February 11, 2025, the SSA removed Gemini from continued consideration.[5] With Gemini's elimination, the SSA awarded the EAGLE task order to Red River as the lowest responsible offeror. Gemini filed this bid protest on March 17, 2025.

## DISCUSSION

### I. Standard of Review

Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC) provides: "[A] party may move for partial or other judgment on the administrative record." RCFC 52.1(c). Where, as here, the parties file cross-motions for judgment on the administrative record, the Court adjudicates the matter "as if it were conducting a trial on the record." *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005), *cited in Young v. United States*, 497 F. App'x 53, 58–59 (Fed. Cir. 2012).

When called upon to review a federal agency's procurement decision, this Court employs the Administrative Procedure Act (APA) standard, and must determine whether the challenged action was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. 5 U.S.C. § 706(2)(A), *cited in* 28 U.S.C. § 1491(b)(4). "The arbitrary and capricious standard is highly deferential and requires this Court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Clean Team Janitorial Serv., Inc. v. United States,* 171 Fed. Cl. 1, 8 (2024) (first citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000); and then citing *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008)). An agency's procurement decision is arbitrary and capricious "if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332

---

[5] The SSA further documented the decision to eliminate Gemini from award consideration in a Memorandum for Record dated February 13, 2025.

(Fed. Cir. 2001) (citations omitted); *see also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009).  With respect to challenges brought under the first ground, the Court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  *Centech*, 554 F.3d at 1037 (quoting *Impresa*, 238 F.3d at 1332–33).  As for the second ground, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."  *Id.* (quoting *Impresa*, 238 F.3d at 1333).

## II. Indirect Costs

Gemini challenges the Army's determination that the contractor's proposed overhead and G&A rates constituted self-imposed caps on indirect rates expressly prohibited by Modification 5.  Directly related to this argument, Gemini faults the Army for failing to seek clarification prior to eliminating the otherwise lowest cost technically acceptable proposal with the required past performance confidence rating.  In resolving this dispute, the Court invokes Occam's razor: the simpler explanation is preferred.

When Gemini submitted its original proposal for the EAGLE task order on September 4, 2024, the solicitation—then governed by Modification 1—permitted voluntary capping or discounting indirect rates so long as the proposed rates were supported by specified data.  As quoted *supra*, in proposing flat overhead and G&A rates below the contractor's historical indirect rates, Gemini proffered that their recent implementation of automated systems and adjustments to corporate staffing have yielded greater efficiencies and, presumably, a reduction in indirect costs.  Critical here are the twin final sentences included in successive paragraphs in Gemini's cost proposal addressing overhead and G&A rates:

> . . . . We are *committed to* the [x]% Overhead rate applied within this offer and *will abide by* said rate should an award be made to GTS in support of this effort.

> . . . . We are *committed to* the [y]% G&A rate applied within this offer and *will abide by* said rate should an award be made to GTS in support of this effort.

AR 1447 (emphasis added).  Black's Law Dictionary defines "commitment" to mean: "[a]n agreement to do something in the future, esp. to assume a financial obligation" and "[a] promise to do something or to behave in a particular way."  *Commitment*, *Black's Law Dictionary* (12th ed. 2024).  The phrase "abide by" is similarly defined as "to act in accordance with or in conformity to."  *Abide (with by)*, *Black's Law Dictionary* (12th ed. 2024).  Gemini's "commitment to . . . abide by" the flat overhead

and G&A rates throughout the life of the multi-year contract bears all the hallmarks of a self-imposed cap on indirect rates permitted by Modification 1. This conclusion is bolstered by the immediately preceding sentences, wherein the contractor seemingly proffers the then-required supporting data.

Notwithstanding the Army's subsequent adoption of a blanket prohibition of voluntary caps and discounts on indirect costs through Modification 5, Gemini's October 30, 2024 revised proposal included the identical overhead and G&A terms proffered in the contractor's September 4, 2024 submission. *Compare* AR 610 *and* AR 1447, *with* AR 667 *and* AR 4850. Gemini now asks this Court to conclude that the contractor's "commitment to . . . abide by" the proposed flat overhead and G&A rates throughout the life of the multi-year contract were either: (1) never intended to convey self-imposed caps on indirect rates, even though such terms were allowable under Modification 1 when initially offered; or (2) sufficiently ambiguous as to require the Army to seek clarification. The simplest explanation is that Gemini initially included (and endeavored to support) the proposed fixed overhead and G&A rates as permissible self-imposed caps on indirect rates under Modification 1, and then neglected to remove or amend these terms after the Army prohibited such proposals in Modification 5.[6, 7] Whatever Gemini's undisclosed intention, there is no basis in fact or in law for this Court to conclude that the SSA's documented understanding of the proposal as including disqualifying caps or discounts on indirect rates was arbitrary, capricious, an abuse of discretion, or contrary to law.[8]

Gemini's claim that the Army erred in not seeking clarification fares no better. As this Court explained in *KACE Co. v. United States*:

---

[6] Gemini's current contention that the above-quoted language was intended to convey the company's "commitment to . . . abide by" the recently adopted efficiencies is belied by the proposal itself. In each instance, the proffered commitments and abidance are directly followed by the specified [x]% overhead rate and [y]% G&A rate as opposed to the efficiencies cited in the previous sentence to support Gemini's ability to commit and adhere to the fixed rates. To this point, it is not lost on the Court that the singular use of the bold font in Gemini's cost/price proposals is to emphasize the "[x]%" and "[y]%" fixed rates. AR 1447.

[7] Curiously, Gemini does not challenge the Army's cost realism analysis, wherein the procuring contracting office cited the unrealistically low indirect rates in adding nearly ${redacted} to Gemini's total proposed price as a most probable cost adjustment.

[8] The Court rejects Gemini's argument that the December 23, 2024, and January 13, 2025 cost analyses are materially inconsistent, undermining the SSA's citation to both reports in support of his decision. Any daylight between the two cost analyses simply reflects the analyst first flagging the potential self-imposed caps on indirect rates and then more definitively concluding that the proffered rates are in fact prohibited. Further, after reviewing the cost analyses and consulting with the SSEB, the SSA exercised his independent judgment in concluding that Gemini's proposal included prohibited self-imposed caps on indirect costs requiring the contractor's elimination from further consideration.

> Under FAR 15.306(a)(1)-(2), clarifications are "limited exchanges" in which the Government is permitted—but not required—to allow offerors to "clarify certain aspects of proposals . . . or to resolve minor clerical errors." *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1346 (Fed. Cir. 2021). In other words, errors may be fixed with clarifications under FAR 15.306(a) where they are obvious, clerical mistakes. Clarifications are not intended to cure deficiencies or material omissions, materially alter the technical or cost elements of the proposal, or otherwise revise the proposal. *See Dell Fed. Sys., LP v. United States*, 906 F.3d 982, 998 (Fed. Cir. 2018); *see e.g., Safeguard Base Operations*, 989 F.3d at 1346 (deficiencies and material omissions cannot be cured through clarifications); *ManTech Advanced Fed. Sys. Int'l, Inc. v. United States*, 141 Fed. Cl. 493, 507 (2019) (inclusion of additional labor category chargeable to contract that violated solicitation could not be corrected through clarifications).

167 Fed. Cl. 192, 207 (2023). Consistent with this standard, the EAGLE task order solicitation provided: "[T]he Government may request clarifications as needed." AR 713. Here, there was no need. The SSA reasonably read Gemini's proposal as including disqualifying caps on indirect rates in violation of Modification 5 to the solicitation.

The onus is not on the government to find ways to clarify or correct material errors in submitted proposals. Rather, as the offeror, Gemini "bore the burden 'to submit a well-written proposal with adequately detailed information that allow[ed] for a meaningful review.'" *SSI Claimsnet, LLC v. United States*, 170 Fed. Cl. 725, 743 (2024) (quoting *Structural Assocs., Inc./Comfort Sys. USA (Syracuse) J.V. v. United States*, 89 Fed. Cl. 735, 744 (2009)). To this point, caselaw in this area limits clarifications under FAR 15.306(a)(1)-(2) to situations involving obvious minor and clerical errors rather than, as presented here, the inclusion of materially disqualifying terms. *See KACE Co.*, 167 Fed. Cl. at 207–08 (collecting cases). Indeed, had the Army sought clarification related to the identified caps on indirect costs included in Gemini's proposal and ultimately awarded the EAGLE task order to Gemini as the lowest responsible bidder, Red River or another technically acceptable offeror likely would have viable grounds to protest.[9]

### III. Strict Compliance Review

Gemini next contends that the Army's decision to waive strict compliance review was improper and otherwise arbitrary, capricious, and an abuse of discretion. In waiving strict compliance *after* the preliminary review was conducted, Gemini

---

[9] Even if the Army *could* have sought clarification on this issue, there is no basis for this Court to conclude that the Army *should* have done so—let alone that the Army was *required* to do so and its reported failure in this regard was arbitrary, capricious, an abuse of discretion, or was contrary to law.

maintains the Army improperly waived the substantive *results* of the strict compliance review rather than the procedural review itself. Put another way, Gemini posits that the Army may only waive strict compliance *before* the review is conducted. The Court disagrees.[10]

Paragraph M.2 of the solicitation provides in part, "The Government reserves the right to: waive the strict compliance review, limit the competitive range for the purpose of efficiency; conduct discussions at any stage of the evaluation process; and make no award should no offer prove to be acceptable based on the criteria set forth in this RFP." AR 737. Paragraph M.3, in turn, further clarifies, "The government reserves the right to waive the Strict Compliance Review if it is in the Government[']s best interest." *Id.* The open-ended language does not impose a time restriction on when the strict compliance review may be waived or prescribe the permissible circumstances for a waiver beyond the generic reference to "the Government[']s best interest" as determined within the Army's reserved discretion. As this case makes clear, the best interest of the government is typically not known until *after* the strict compliance review is performed. On the front end, the quantifiable benefits are generally limited to the potential savings of time and effort in undertaking the strict compliance review.

The Procuring Contracting Officer considered the limited number of proposals received in response to the solicitation and the fact that at least three of the five proposals were deemed non-compliant during the strict compliance review. Noting that the deficient proposals would undergo technical evaluations, the agency official cited the need for greater competition to ensure a best value contract award. Of stated concern, proceeding to the technical evaluation with only two offerors raised the prospect that additional evaluations would be required if either proposal was found technically unacceptable. Of particular note, strict compliance review is readily distinguishable from the technical evaluation because it focuses on form over substance. By way of example, Red River was found non-compliant on four items in the strict compliance review: (1) attaching a Standard Form 30 instead of a Standard Form 33, (2) missing a system audit explanation, (3) including a Staffing and Management Plan with internal comments, and (4) a mismatched reference number. At bottom, the post-review assessment allows the government official to make an informed decision regarding waiver.[11]

---

[10] In addressing this issue, the Court rejects defendant's citation to *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007). It would have been implausible and impractical for Gemini to file a pre-award bid protest without knowing, for example, whether the Army would (or did) waive the strict compliance review, and whether Gemini and or any other offerors would (or did) benefit from the waiver.

[11] The Court declines to follow Gemini down the proverbial rabbit hole wherein all other offerors are eliminated during the strict compliance review, forcing the Army to engage in formal discussions with Gemini and allowing the contractor to remove the identified self-imposed caps on indirect rates. The proffered scenario undermines the integrity of the procurement process by mandating the elimination of offerors for using the wrong font size or including an extra tab in their proposals, for example, while

## IV. Disparate Evaluation

The FAR requires agencies "to treat offerors fairly and impartially" but not identically. *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (citing 48 C.F.R. §§ 1.102-2(c), 1.602-2(b)). This level playing field necessarily covers the proposal evaluations. *Id.* To assert a viable disparate evaluation claim, "a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals."[12] *Id.* (collecting cases). The Court's role is limited in these cases to ensuring the agency applied the same evaluation criteria in a fair and impartial manner. *Id.*

Gemini contends the Army failed to subject Red River's cost proposal to the same scrutiny that caused Gemini's disqualification. In support, Gemini cites the following entry in the Army's cost realism analysis of Red River's proposal: "Red River proposed ${redacted} in overhead costs." AR 8678. Gemini posits this entry reflects the Army's understanding that Red River proposed a substantially indistinguishable cap or discount on indirect rates that prompted Gemini's elimination from further consideration and resulted in the EAGLE task order award to Red River. Although facially appealing, Gemini's disparate evaluation claim fails upon careful examination of the record. The short answer is that Red River's proposal accounts for the projected indirect costs to be incurred during the lifecycle of the contract but uses different accounting labels and allocations than Gemini.

The solicitation generally states: "The Offeror shall provide the pool and base costs . . . for all proposed indirect expense rates." AR 730. The RFP does not specify *how* these costs are to be accounted for so long as they are in fact included in the cost proposal. Red River historically organizes its costs into {redacted} categories: {redacted}.[13] These categories collectively include all projected costs of the project as exhibited in Red River's identical accounting of costs actually incurred as the incumbent contractor and projected future costs. Indeed, a comparative review of the costs included in Gemini's overhead rate are generally accounted for in Red River's cost proposal as {redacted} costs. Red River further clarified that the contractor's traditional {redacted} costs are {redacted} on this project, explaining the company {redacted}. That the Army summarily captured this accounting data by noting that "Red River proposed ${redacted} in overhead costs" does not equate to a statement by

---

compelling the contract award to the offeror found to have proposed a materially disqualifying cost term that was the subject of a specific modification and solicitation of revised proposals.

[12] During oral argument, counsel for Gemini acknowledged that the deficiencies waived following the preliminary strict compliance review were not "substantively indistinguishable" from the disqualifying cap on indirect costs cited by the Army in the step two cost/price evaluation.

[13] The administrative record includes a finding by the Defense Contract Audit Agency (DCAA) that "[Red River's] accounting system design complies in all material respects with the criteria contained in FAR 53.209-1(f), Standard Form 148." AR 1489.

the contractor that it was "committed to . . . abide by" fixed indirect rates below those historically incurred (or projected). At bottom, the Army evenhandedly evaluated Gemini's and Red River's cost proposals.

## CONCLUSION

For these reasons, plaintiff's motion for judgment on the administrative record (ECF 27) is DENIED and defendant's and defendant-intervenor's cross-motions for judgment on the administrative record (ECF 29 and 34) are GRANTED. The Clerk of Court is directed to enter judgment accordingly. No costs.

It is so **ORDERED**.

Armando O. Bonilla
Judge